NATIONAL CIRCLE, DAUGHTERS OF ISABELLA, v. NATIONAL ORDER OF THE DAUGHTERS OF ISABELLA.

(District Court, N. D. New York. May 19, 1916.)

1. JUDGMENT ☞815—EFFECT.

A decision of the state court that complainant order had first adopted a particular name and was entitled to use it, and that defendant order was not entitled to establish branches within the state under a similar name, is local, and of no extraterritorial effect.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1445-1448; Dec. Dig. ☞815.]

2. INSURANCE ☞692—FRATERNAL ORDERS—INCORPORATION.

A fraternal order incorporated under the laws of New York, whose business was the installation of subordinate branches, is entitled to establish such branches outside of the state, even in the absence of express or explicit authority.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1832; Dec. Dig. ☞692.]

3. CORPORATIONS ☞49(2)—NAMES—MUTUAL INSURANCE COMPANIES.

The complainant order first adopted the name National Circle, Daughters of Isabella. At that time it was a voluntary association existing in Connecticut. Thereafter the order was incorporated. Prior to its incorporation the defendant order, under the name National Order of the Daughters of Isabella, was incorporated in the state of New York. Defendant's articles of incorporation recited that the territory in which its operations were to be principally conducted was the United States of America and the Dominion of Canada. Defendant first began to establish branches of the order, and even invaded complainant's domiciliary state. After an adjudication by the Connecticut court that complainant was entitled to priority in the use of the name, complainant began to establish branches in other states. *Held* that, as it did not appear that defend-

ant was guilty of misrepresentations, it would not be enjoined from establishing or maintaining branches in territory not pre-empted by complainant, for complainant's rights did not extend beyond the state lines of Connecticut, where it had priority; it being unknown outside of the state, and the incorporation in Connecticut not giving it the right to exclude defendant from other states.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 137; Dec. Dig. ☞49(2).]

4. INJUNCTION ☞145—INJUNCTION PENDENTE LITE—RIGHT TO.

An injunction pendente lite, restraining the defendant order from using a name similar to that of complainant, which would affect a great number, will not be granted on averments on information and belief that defendant was guilty of fraud in representing that it was the same order as complainant.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 318, 321; Dec. Dig. ☞145.]

In Equity. Bill by the National Circle, Daughters of Isabella, against the National Order of the Daughters of Isabella. On application by complainant for an injunction pendente lite. Application denied.

This is an application by the National Circle, Daughters of Isabella, for an injunction, pendente lite, enjoining and restraining the defendant, the National Order of the Daughters of Isabella, its subordinate branches, lodges, members, and agents, etc., from "establishing any further or other branches of the National Order of the Daughters of Isabella in any part of the United States, and from establishing or organizing any branch, lodge, circle, or other subsidiary organization under any name or title in which the words 'Daughters of Isabella' shall appear, and from using in the organization or establishment of any branch, lodge, circle, or other subsidiary organization any name, title, or emblem so similar to the words 'Daughters of Isabella' as to be likely to create confusion, or to deceive or induce persons to treat with the same as if such branches, lodges, circles, or subsidiary organizations were in fact part of or connected with the National Circle, Daughters of Isabella, or with its legally constituted branches, and from using or continuing to use such name, title, or emblem, or any name, title, or emblem so similar thereto as to be likely to create confusion, or to deceive the public, or to induce persons to join or treat with the same as if such branches, lodges, circles, or other subsidiary organizations were in fact branches, lodges, circles or subsidiary organizations of the said National Circle, Daughters of Isabella." The object of the order applied for shows the purpose and object of the suit. The bill of complaint prays an accounting also.

Mills & Mills, of Albany, N. Y. (C. F. Roberts, of New Haven, Conn., of counsel), for complainant.

P. H. Fitzgerald, of Utica, N. Y. (Richard R. Martin, of Utica, N. Y., of counsel), for defendant.

RAY, District Judge (after stating the facts as above). The bill of complaint alleges that the complainant, National Circle, Daughters of Isabella, came into existence as follows: That in May, 1897, a voluntary fraternal secret benefit organization was formed in the city of New Haven, county of New Haven, state of Connecticut, and that it adopted a constitution and ritual based upon and drawing moral lessons from the historical connection of Isabella, the queen of Spain, with the dispatch of Christopher Columbus upon the voyage which resulted in the discovery of America. That in the year 1900 this organization adopted, and that its members publicly wore, a society pin upon the face and front of which appeared certain letters and symbols by

which such members were known to each other and to the public as "Daughters of Isabella," and that said name became the name by which said members were known among themselves and to and by many persons not connected with such association. That on the 12th day of February, 1904, the members of said voluntary organization passed a vote that they should become incorporated, and March 4, 1904, passed a vote to become incorporated under the name and title of "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus." That March 7, 1904, said organization became incorporated under said last-mentioned name under and pursuant to the laws of the state of Connecticut. That for the seven years prior to this time said organization had been carrying on its said work under the name "Daughters of Isabella," and by said name was publicly known, and also among the members thereof. That said corporation, without capital stock, was duly organized as a secret fraternal benefit society for women of the Catholic faith under the same constitution and using the same pin, ritual, etc., as had been used by said association prior to said incorporation, and that the members of the said association became members of such corporation, which succeeded to all the rights, etc., of such association. That no other corporation or organization at such times had acquired the right to use as a designating part of its name the words "Daughters of Isabella." That November 5, 1904, the said articles of incorporation were so amended under the laws of the state of Connecticut as to allow the said corporation to form and establish subordinate branches and lodges thereof, and to give to them and to the members thereof the name and title "Daughters of Isabella." That between March 7, 1904, and July 25, 1907, under and pursuant to such articles of corporation and the amendments thereof, said corporation established "in the state of Connecticut and elsewhere" subordinate lodges or branches thereof under the name and title of "Daughters of Isabella" and that such subordinate lodges or branches had a membership of more than 1,500. That in January, 1907, the General Assembly of the state of Connecticut, at the request of said incorporators and of the duly accredited representatives of such subordinate branches, and on application therefor, granted a special charter to the complainant by which the said incorporators and those to be associated with them were created a body politic and corporate under the name and title, "the National Circle, Daughters of Isabella," with authority to establish branches "in Connecticut and elsewhere." That such charter was accepted and the organization was perfected, and the original organization, corporation, and subordinate branches became and now are a part of and affiliated with said complainant, "the National Circle, Daughters of Isabella." The bill of complaint then alleges as follows:

"12. Your orator further alleges that under and pursuant to the provisions of said charter granted to the plaintiff by the General Assembly of Connecticut as aforesaid, said corporation was given power to locate and establish state and district circles, as local or subordinate circles, or other branches or divisions thereof, under the name of 'Daughters of Isabella,' composed of members of the order in any town or city in the state of Connecticut, or in any other state of the United States, or in any other country,

and said state, district, or local circles, or other branches or divisions, when so established, to be governed and managed by such laws, by-laws, rules, and regulations as said corporation shall determine, and further providing that said corporation may enforce such laws, by-laws, rules, and regulations against any such state, district, or local circle or circles, or other branches or divisions, in any court of this state, or of any other state of the United States. A copy of said charter is attached hereto as Exhibit A and made a part hereof.

"13. Your orator further alleges that, under and pursuant to the authority conferred by said charter, your orator has established many subordinate lodges or branches in the following states: Connecticut, Illinois, Massachusetts, Rhode Island, Wisconsin, Indiana, Kansas, and Nebraska."

## Defendant's Incorporation and Acts.

The bill of complaint then alleges and states that June 24, 1903 (prior to the date of complainant's incorporation), John E. Carberry and seven others, as incorporators, were granted articles of incorporation under and pursuant to the laws of the state of New York (General Incorporation Laws [Consol. Laws, c. 23]) under the name and title "Daughters of Isabella," which articles of incorporation were amended August 7, 1905, by which amendment the title of said New York corporation was changed to "the National Order of the Daughters of Isabella," under which name and title it has ever since been known. The bill of complaint also alleges: That said New York corporation as originally incorporated had no authority under its said articles of incorporation and has acquired no power since, under the laws of the state of New York or of any other state, to establish subordinate branches or lodges in the state of New York or any other state of the United States or elsewhere. That the defendant, the National Order of the Daughters of Isabella, has established in Massachusetts, Rhode Island, Indiana, Pennsylvania, New York, Michigan, Illinois, Wisconsin, Iowa, New Jersey, Maryland, District of Columbia, Georgia, and other states of the United States local lodges or branches of said (defendant) corporation, the members of which are women known among themselves and to the public at large as "Daughters of Isabella," and that said local lodges or branches are known to the members thereof and to the public as "the Daughters of Isabella," and are not known or designated by any other name, except by a distinguishing name adopted by each branch. The bill of complaint further alleges:

"17. Your orator further alleges that said the National Order of the Daughters of Isabella has designated said local or subordinate lodges or branches and claims the right to designate said local and subordinate lodges or branches and the members thereof as 'Daughters of Isabella,' and said lodges, and the members thereof, as hereinbefore set forth, are now known among themselves and to the public under the name and title of 'Daughters of Isabella,' and claim the right to be known under said name and title, thereby causing, in all places in which your orator, in the exercise of its corporate rights and the use of its corporate name, has established local or subordinate lodges or branches under said name and title, 'Daughters of Isabella,' because of the identity of the name used by the subordinate branches of the defendant with the name used by the subordinate branches of your orator and the members thereof, and it has created and is likely to create great confusion and uncertainty in the minds of many persons, and has deceived and operated to induce many persons to join or treat with the National Order of the Daughters of Isabella and its subordinate branches under the

belief that the same is your orator, or a subordinate branch of your orator, to the irreparable injury of your orator.

"18. Your orator further alleges that on divers days since the 7th day of March, 1910,· down to the date of this complaint, your orator has been requested by many persons to establish lodges and subordinate branches in a large number of towns and cities in the states of Michigan, Wisconsin, Illinois, Indiana, Kansas, Nebraska, Iowa, Minnesota, Ohio, Pennsylvania, District of Columbia, and other states of the United States, but because of the false and willful misrepresentations on the part of the officers of the National Order of the Daughters of Isabella, and its servants and agents, that your orator was merely a local organization and without authority or power to establish said branches under the name or title of Daughters of Isabella, and was without lawful right to said title, the efforts of your orator to establish said branches under said name and title have been, and are now, and threaten to hereafter be, thwarted and defeated, to the great loss of membership of your orator, and to the further irreparable injury of your orator.

"19. Your orator further alleges that the National Order of the Daughters of Isabella, through its officers and agents, by speeches, advertisements, arguments, the circulation of literature, and the holding of public meetings, is seeking to organize other subordinate lodges or branches of the National Order of the Daughters of Isabella within said states mentioned aforesaid, and other states of the United States, under said name and title of 'the Daughters of Isabella,' to the further irreparable injury of your orator.

"20. Your orator further alleges that the National Order of the Daughters of Isabella by itself, and through its servants and agents, in the states aforesaid, and in other states of the United States, has been and is now engaged in all the ways above set forth in causing great and irreparable injury to your orator, and by the continued use of said name 'Daughters of Isabella' as aforesaid have caused, are now causing, and threaten to hereafter cause great confusion and annoyance, loss, and irreparable injury to your orator. And because of the similarity and practical identity of the name used by the National Order of the Daughters of Isabella, and by the branches thereof, with the name of your orator, and of the subordinate branches and members thereof, many persons eligible for membership in your orator's organization have been, are now, and hereafter may be led to believe that the defendant is in fact your orator, to the great and irreparable injury of your orator."

The allegations of the complaint are largely on information and belief. The complainant has also filed the affidavit of Josephine C. Curran, the national secretary of the National Circle, Daughters of Isabella, in which she gives the number, location, membership, and date of institution of the subordinate circles of the complainant. It appears from this affidavit that the total number of subordinate circles is 45, of which 7 are in Connecticut, 6 in Massachusetts, 6 in Rhode Island, 18 in Illinois, 4 in Indiana, 2 in Wisconsin, 1 in Missouri, and in the case of the other circles the state is not given. The earliest subordinate circles established in Massachusetts and Rhode Island were so established in 1912. The earliest circles established in Illinois were so established in 1911. The earliest circles established in Indiana, Wisconsin, and Missouri were established in 1915. Of the circles established in Illinois, 14 are located in the city of Chicago, 1 at Alton, 1 at Lemont, 1 at Odell, 1 at Collinsville, 1 at Bloomington, and 1 at Maywood. Seven of these subordinate circles were established in 1916, 18 in 1915, 5 in 1914, 5 in 1913, 5 in 1912, 3 in 1911, 1 in 1905, and 1 in 1897. The subordinate circles established in Massachusetts are located at Springfield, Holyoke, Worcester, Pittsburg, North Attleboro, and Webster. Of the 6 subordinate circles located in Rhode Island, 1 is at Riverside, 1 at Pawtucket, 1 at Ashton, 1 at Woonsocket,

and 2 at Providence. The 4 in Indiana are located at Indianapolis, East Chicago, Terre Haute, and Connorsville.

The defendant, the National Order of Daughters of Isabella, files an affidavit showing that it has 276 subordinate courts, many of which have a membership of 150 or more, and some have a membership in excess of 300. These courts or subordinate bodies are scattered through 33 different states, viz., New York, Pennsylvania, Georgia, Wisconsin, Iowa, Kansas, New Jersey, South Carolina, Florida, Illinois, Mississippi, Virginia, Louisiana, Oklahoma, Missouri, Indiana, Wyoming, Rhode Island, Texas, Oregon, South Dakota, California, Massachusetts, Ohio, Idaho, New Hampshire, North Dakota, Vermont, Minnesota, Montana, Maryland, Arizona, Nebraska, and 1 in the District of Columbia. The earliest subordinate court was established in Illinois in 1905, in Massachusetts in 1909, in Rhode Island in 1909, in Indiana in 1908, in Missouri in 1907, and in Wisconsin in 1911.

The defendant in its answer denies that the establishing of subordinate lodges by the defendant has deceived and deceives and operates to induce persons to join or treat with the defendant or its subordinate branches in the belief that the defendant or its branches is the complainant or its branches. In fact the defendant in its answer puts in issue substantially all the material allegations of the complaint. The defendant admits and avers that for more than 10 years prior to the commencement of this action the defendant, under the name of "Daughters of Isabella" and under the name of "the National Order of Daughters of Isabella," has been in active operation and engaged in the lawful prosecution of its lawful activities, with its principal office at the city of Utica, N. Y. The defendant also files the affidavit of one Michael F. Kelly, who says that he has been a member of the body known as "Knights of Columbus" since 1896, and that during the year 1901 he, with others, "conceived the idea of organizing a similar society among women of the Catholic faith, designed to promote the social and educational interests of women of the said faith, and in some degree to assist its members in a financial way as necessity might require, which said organization would have branches in the various cities and towns of the United States and be known as 'Daughters of Isabella.'" He also says that in February, 1902, it was publicly stated in the public press that such a project was on foot and that the name of the organization was "Daughters of Isabella." He also says:

"The selection of the name 'Daughters of Isabella' by deponent and those associated with him, both men and women, in the organization of said society, was had solely in view of the connection in history of Queen Isabella of Spain with the efforts of Columbus to make his voyage for the discovery of America, and without any knowledge or information whatsoever that said name was anywhere in use by any organization for any such purpose or any purpose; that in the development of the plans for the said organization in the latter part of the year 1902 there was prepared by-laws for said organization, in which said by-laws the organization was named 'Daughters of Isabella,' and in which said by-laws it was provided that such organization should comprise a central body at the city of Utica, N. Y., and also branches or courts to be organized where practicable in various cities and towns of the United States and the Dominion of Canada."

He also says that the aggregate membership of the various courts of the defendant is now in excess of 25,000. Mr. Kelly also says that the

right of the defendant to pursue its purposes as set forth by him has never been challenged, except within the state of Connecticut.

It appears and is not disputed that in October, 1907, "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus, and the National Circle, Daughters of Isabella," commenced an action against the National Order of Daughters of Isabella and others in the superior court of the state of Connecticut, county of New Haven, for the purpose of seeking a temporary injunction, and also a permanent injunction, restraining the defendant, said New York corporation, from establishing any further branches within the state of Connecticut under said name or title "Daughters of Isabella," and also restraining all subordinate branches of the said New York corporation now (1907) in existence within the state of Connecticut from continuing to use said name or title. The action appears to have been based on the fact that the Connecticut corporation was entitled to the name "Daughters of Isabella" in the state of Connecticut in preference and to the exclusion of the defendant, the New York corporation, by reason of the fact that the Connecticut organization and corporation first took and used the name in that state. Demurrers were interposed, but the cause came on to be heard finally, and resulted in a judgment or decree against "the National Order of the Daughters of Isabella, a corporation organized under the laws of the state of New York and doing business in the state of Connecticut," and the various subordinate circles situate in the state of Connecticut as follows, viz.:

"Whereupon it is adjudged that the defendant, the National Order of the Daughters of Isabella, and its servants and agents, be and it is hereby enjoined, under a penalty of $1,000 from establishing any further branches within the state of Connecticut under said name or title 'Daughters of Isabella,' and that all subordinate branches of said National Order of the Daughters of Isabella now in existence within the state of Connecticut be and the same are hereby forever prohibited and enjoined under a similar penalty of $1,000 from using said name or title, and that the plaintiffs recover of the defendants $25 damages and the costs taxed at $———.

"By the court:                                   John Currier Gallagher, Clerk."

This judgment has remained in full force and effect and has been obeyed by the defendant.

[1] There can be no question that the judgment in the state of Connecticut just recited, in view of the pleadings, was and is res adjudicata between this plaintiff and defendant that the name "Daughters of Isabella" in an organization of the description given was first used and adopted by an organization unincorporated in the state of Connecticut, in that state. The decision of the Connecticut courts went upon that theory, and in legal effect the court so adjudged. That was the judgment of a state court, and had and has no extraterritorial effect, except in so far as it establishes that in the state of Connecticut the complainant here and its predecessors first used the said name and became entitled to use it in said state of Connecticut, and that the defendant had no legal right to establish subordinate courts or branches in that state using the name. It was local in its effect and operation.

232 F.—58

[2, 3] It is seen that to grant the injunction pendente lite prayed for in the bill of complaint in this action would be far-reaching in its effect and break up and put out of business 276 subordinate branches or courts and affect about 25,000 women. In Hanover Star Milling Co. v. D. D. Metcalf, and in Allen & Wheeler Co. v. Hanover Star Milling Co., 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. ——, causes argued and decided together, decided by the Supreme Court of the United States, March 6, 1916, we have a decision which in my judgment is determinative of this application for a preliminary injunction. That is a trade-mark or trade-name case, but is, I think, in many of its aspects on all fours with this.

The defendant, since the commencement of the suit in the superior court of the state of Connecticut, has been active in many of the states of the United States in establishing branches or courts, and until now its right so to do has not, so far as appears, been challenged. This has not been done secretly, and the evidence now before this court, consisting of the verified bill of complaint and affidavit of Josephine C. Curran, on the one hand, and of the verified answer, supported by the affidavit of Mr. Kelly, on the other, makes it doubtful whether the complainant can show that the establishment of these subordinate courts by the defendant has been with intent or purpose to interfere in any way with the business of the complainant or its establishment of subordinate circles. So far as appears, the defendant has operated largely and almost entirely, excluding from consideration the state of Connecticut, where the rights of the parties have been determined, in new and unoccupied territory. Massachusetts, Rhode Island, and Illinois are exceptions in a way; but in each of these states the defendant first established subordinate courts. In Illinois, as early as 1905, the defendant established courts in Chicago. The complainant established its first circle there, Calumet Circle, No. 22, November 12, 1912, and this has a membership of 285. In 1913 it established Auburn and Hyde Park Circles in Chicago, with a membership of 168 and 101, respectively. Defendant established Court 41 in Chicago July 5, 1905; Court 62 in Chicago, Ill., February 10, 1907; Court 84 at Rock Island, Ill., April 26, 1908; Court 89 at Chicago, Ill., August 31, 1908; Court 112 at Chicago, Ill., June 27, 1909; Court 120 at Chicago, Ill., October 24, 1909; Court 124 and Court 125 at Chicago, Ill., March 6 and May 1, 1910, respectively; Courts 135 and 136 at Chicago, Ill., March 19, and March 26, 1911, respectively; Courts 143, 144, 145, and 147 at Chicago, Ill., June 11, May 7, June 4, and May 28, 1911, respectively; Court 148 at Springfield, Ill., June 11, 1911; and Court 153 at Chicago, Ill., September 10, 1911 —all prior to the establishment of any circle in that state by the complainant.

Unless the prior and first use of the name "Daughters of Isabella" by complainant in the state of Connecticut, and the want of an express provision in the statutes of the state of New York authorizing defendant to establish subordinate courts in states other than New York, the state of its incorporation, legally debarred the defendant from establishing such courts in the state of Illinois, the defendant, by reason of first having occupied that territory, has the prior right thereto, or at least

its occupation of that territory was and is not unlawful. Hanover Star Milling Co. v. Metcalf and Allen & Wheeler Co. v. Hanover Star Milling Co., supra. That the prior and first use of the name by the organization, unincorporated, which later became incorporated, gave a right to the use of the name in the state of Connecticut, may be conceded, and it has been so adjudicated. But before that organization became a corporation, a similar organization with similar objects and purposes, and using as part of its corporate name the words "Daughters of Isabella," was incorporated in the state of New York under and pursuant to its laws. There is no substantial or convincing evidence that this was done for the purpose of interfering with the Connecticut organization, and Mr. Kelly says, in substance, the organizers of the New York Association and corporation were ignorant of the use of the name "Daughters of Isabella" by the members of the Connecticut association or any other association. In the absence of some adjudication or satisfactory evidence to the contrary, this statement under oath must be assumed to be true. Aside from general allegations in the bill of complaint, made on information and belief and wholly unsupported by affidavits as to any act of interference, it appears from the affidavit of Josephine C. Curran that up to March, 1911, only Russell and San Salvadore Circles were instituted by complainant, both at New Haven, Conn., and that in March, 1911, Isabella Circle was instituted at New Britain, Conn., and that in June, 1911, Silver City Circle was instituted at Meriden, Conn., and that in October, 1911, Kennedy Circle was instituted at Naugatuck, Conn. All the other circles, wherever located, were instituted in 1912 and later. No affidavit of any person is presented showing any act of interference or the making of any misrepresentation or misstatement by any person. In the meantime the defendant, having incorporated as stated, seems to have been active in organizing and instituting subordinate courts in many different states outside of New York and Connecticut. There is no evidence before the court that any person on his or her own motion, or any person representing the defendant corporation, has interfered with the work of the complainant in organizing circles outside of Connecticut and in states where the field was open to both. Regarding and treating the use of the name "Daughters of Isabella" as on the same footing before the law as the use of a trade-mark or a trade-name it is plain, in view of the last utterance of the Supreme Court of the United States, that, in the absence of acts showing the use of unfair means, or unfair competition, the defendant has, so to speak, pre-empted the territory in all the states mentioned outside of Connecticut. Even in Rhode Island the defendant established a court at Newport in June, 1909, while the complainant did not enter that state until July, 1912, when it established Riverside Circle at Riverside in that state, and this was followed by Pawtucket Circle at Pawtucket, R. I., in May, 1913. In Massachusetts, May 2, 1909, the defendant established a court at Stoneham, and followed this by Court No. 138 at Cambridge, Mass., on the 23d day of April, 1911. The complainant established its first circle in Massachusetts at Springfield on the 21st day of January, 1912, and followed this by another at Holyoke in that state April 21, 1912.

I am not aware of any rule of law or equity which gives to the general Legislature of the state of Connecticut power to incorporate such a body as the complainant, and by conferring on it power to establish subordinate bodies in Connecticut "and elsewhere," or "in the other states of the United States," debar a similar body or organization incorporated in the state of New York under its general corporation laws from organizing subordinate bodies "elsewhere," or in the other states of the United States, so long as those states do not act and recognize the one corporation and refuse to recognize the other by statute or decisions of the courts. The corporation laws of the state of New York require that the articles of incorporation state where the corporation proposes to do or carry on business, and this requirement was complied with by naming the entire United States and the Dominion of Canada. "The territory within which its operations are to be principally conducted is the United States of America and the Dominion of Canada" is the statement in the articles of incorporation. I know of no case which holds that a New York corporation organized under its general corporation laws may not carry on its business in any state of the Union, unless such state in which it proposes or undertakes to do business by statute or court action interferes. It appears that the installation of subordinate courts is a part of the business of the defendant, and I do not think the absence of express or explicit authority to do such an act outside of New York in any way impairs defendant's power in this respect. It is true, probably, that, should the defendant here enter a state in which the complainant has first established circles, thus occupying and, so to speak, appropriating that territory, the defendant would have no right to there establish subordinate branches or courts. Clearly defendant would invade the complainant's rights, should it use false representations or statements orally or in writing to induce persons to join its branches or courts in the belief they were joining a branch or circle of the complainant corporation or organization. The names are so similar that false statements and representations might easily lead to confusion.

In Salvation Army in the United States v. American Salvation Army, 135 App. Div. 268, 120 N. Y. Supp. 471, it appears that as early as 1878 the "Salvation Army," an organization conducting a religious, charitable, and benevolent work, was organized in England. In 1880 General Booth, who organized that society, sent a small band of followers to the United States, and established a branch in the United States, and the movement gradually spread through the United States until in October, 1884, there were over 80 posts in various states of the United States, with 300 officers and several thousand members and soldiers. It spread all over the civilized world. This organization had a publication, "War Cry," and a distinctive uniform for all its members. April 28, 1899, a special charter was granted to the Salvation Army by the Legislature of the state of New York, and all its temporalities and property were vested in such corporation. August 27, 1896, the defendant "American Salvation Army" was incorporated in the state of Pennsylvania. The members of this corporation wore distinctive uniforms similar to those of the Salvation Army in the United States,

and also published a paper at irregular intervals named "American War Cry," and later "American Salvation Army War Cry." It operates in 71 places in 12 states, and has 300 officers and 2,500 members. The court found that many of the employés and agents of the said American Salvation Army falsely represented themselves to be connected with and operating for the Salvation Army in the United States. The defendant American Salvation Army did not undertake to operate in the state of New York until April, 1907. The Appellate Division said:

"It is so clear as to hardly justify discussion that the purpose of the defendant in assuming the names 'American Salvation Army' for its organization and the 'American War Cry' for its paper, and its adoption of the military titles and the uniforms, and its whole scheme of procedure, was to take advantage of the long-established and wide-spread public knowledge of the Salvation Army, and to receive for itself whatever benefit might flow therefrom. While its object in organizing may have been entirely laudable, its assumption of the *physical attributes of its predecessor in the field*, with slight and colorable differences, was obviously an imitation, and calculated, if not deliberately designed, to deceive."

It is already seen that in the case now before this court there has been no assumption by the defendant of the physical attributes of the Connecticut organization or corporation, and that, aside from the state of Connecticut, the defendant has been the *"predecessor in the field."* Aside from general allegations in the bill, made on information and belief, without stating the sources of such information or the grounds of belief, and which general allegations are denied, and which general allegations are wholly unsupported by an affidavit showing false or misleading statements, there is nothing before this court to show fraud or deception. This court does not know what will be the proof on the trial, but as fraud and deception cannot be assumed, and must be proved, this case now stands on the fact of similarity of names, "Daughters of Isabella," the main feature of the name of both parties, and on the prior or first use of that name by the Connecticut organization in that state solely. In all other states the defendant was first to occupy and appropriate the field and establish subordinate branches, or so-called courts. And this prior occupation and appropriation of territory has been going on for more than ten years, and for some six years since the final decision of the suit brought in the state of Connecticut, without interference or molestation, and resulting in the establishment of more than 300 courts in 33 different states of the United States, with some 25,000 members.

In Higgins Co. v. Higgins Soap Co., 144 N. Y. 462, 39 N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769, the court said:

"It is well settled that an exclusive right may be acquired in the name in which a business has been carried on, whether the name of a partnership or of an individual, and it will be protected against infringement by another, who assumes it for the purposes of deception, or even when innocently used *without right* to the detriment of another."

This is, of course, common sense, and ought to be sound law; but it does not follow that a person, or a firm, or a corporation, may use a name as a trade, or trade-mark, or business name in a limited territory only, not extending his or its business or the use of the name

beyond that limited territory, and then enjoin and restrain all other users of the name, who have adopted and first used it in new and unappropriated territory for years, without interruption or complaint or interference by the one who first used such name. Of course, in using the name in such new and unoccupied territory, the second user must not represent himself or itself to be such other person or copartnership or corporation, for this would be a fraud and more or less injurious. This is the doctrine enunciated and these the principles declared in Hanover Star Milling Co. v. Metcalf and Allen & Wheeler Co. v. Hanover Star Milling Co., supra. As Mr. Justice Holmes well says:

"As the common law of the several states has the same origin for the most part, and as their law concerning trade-marks and unfair competition is the same in its general features, it is natural and very generally correct to say that trade-marks acknowledge no territorial limits. But it never should be forgotten, and in this case it is important to remember, that when a trade-mark started in one state is recognized in another it is by the authority of a new sovereignty that gives its sanction to the right. The new sovereignty is not a passive figurehead. It creates the right within its jurisdiction, and what it creates it may condition, as by requiring the mark to be recorded, or it may deny. The question, then, is what is the common law of Alabama in cases like these. It appears to me that, if a mark previously unknown in that state has been used and given a reputation there, the state well may say that those who have spent their money innocently in giving it its local value are not to be defeated by proof that others have used the mark earlier in another jurisdiction more or less remote. Until I am compelled to adopt a different view I shall assume that that is the common law of the state. It appears to me that the foundation of the right as stated by the court requires that conclusion. See further Chadwick v. Covell, 151 Mass. 190, 193, 194. Those who have used the mark within the state are those who will be defrauded if another can come in and reap the reward of their efforts on the strength of a use elsewhere over which Alabama has no control. I think state lines, speaking always of matters outside the authority of Congress, are important in another way. I do not believe that a trade-mark established in Chicago could be used by a competitor in some other part of Illinois on the ground that it was not known there. I think that, if it is good in one part of the state, it is good in all. But when it seeks to pass state lines, it may find itself limited by what has been done under the sanction of a power co-ordinate with that of Illinois and paramount over the territory concerned. If this view be adopted, we get rid of all questions of penumbra, of shadowy marches, where it is difficult to decide whether the business extends to them."

And in the main opinion in that case Mr. Justice Pitney says:

"To say that a trade-mark right is not limited in its enjoyment by territorial bounds is inconsistent with saying that it extends as far as the sovereignty in which it has been enjoyed. If the territorial bounds of sovereignty do not limit, how can they enlarge, such a right? And if the mere adoption and use of a trade-mark in a limited market shall (without statute) create an exclusive ownership of the mark throughout the bounds of the sovereignty, the question at once arises, 'What sovereignty?' So far as the proofs disclose, the Allen & Wheeler mark has not been used at all, is not known at all, in a market sense, within the sovereignty of Alabama, or the adjacent states, where the controversy with the Hanover Star Milling Company arose. And so far as the controversy concerns intrastate distribution, as distinguished from interstate trade, the subject is not within the sovereign powers of the United States. Trade-Mark Cases, 100 U. S. 82, 93 [25 L. Ed. 550]."

In Talbot et al. v. Independent Order of Owls et al., 220 Fed. 660, 136 C. C. A. 268, it is held:

"An established voluntary association for religious, fraternal, benevolent, or social purposes is entitled to an injunction against the use by another person, association, or by any corporation, of its name or emblem, and of any name or emblem so similar to it as to be likely to create confusion, or to deceive, or induce persons to join or treat with the latter as the former, because such a use of such a name or emblem in effect perpetrates a fraud upon the former, and upon the persons confused or deceived."

[4] In that case it is seen by reference to the facts that there was a plain purpose or intent by defendants to defraud, and use the name "Order of Owls," as against the rights of the first user of the name and in the same territory. It is not intended to hold or intimate that, should it appear on the trial of this action that defendant has interfered with the complainant by misrepresentations or unfair means in its attempts or efforts to establish circles in states where the complainant had first gained a right, if any, to occupy the territory, this court cannot or will not grant appropriate relief. Before an injunction pendente lite of the sweeping character prayed for is granted, sworn statements on knowledge should be presented which at least show it reasonably probable, if not reasonably certain, that the complainant will be successful on a trial in open court.

Since writing the above the complainant has filed the affidavit of Mary E. Booth, of New Haven, Conn., and she differs from others as to the pin worn by members of the organization, and says that on its face was the figure of a bell, at its head the letters "IS," and underneath the said letters was the letter "A," all signifying "Is a bell." This is different, far, from the words "Daughters of Isabella." She says she read advertisements of social events in the public press, speaking of the "Daughters of Isabella," down to 1905, when she became a member of the organization at New Haven, Conn., known as the "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus." She further says that at the time she became a member in 1905, and for some time prior thereto, she knew that an organization at Utica, N. Y., styling themselves "Daughters of Isabella," was organizing courts or branches in the state of Connecticut, and that one Wm. J. Neary, of Connecticut, and John G. Coyle, of New York City, were territorial regent and deputy, respectively, of said Utica organization (the defendant), and were active in forming courts or branches of said Utica organization *in the state of Connecticut;* that she has letters written by said Neary in January, 1904, to one Anna M. Rourke, of New Haven, then secretary of the New Haven voluntary organization, asking that a committee be sent to assist in the formation of a "branch thereof" at Naugatuck. She then says that she is informed and verily believes that the members of said voluntary organization at New Haven did assist "in promoting" the formation of a branch at Naugatuck, Conn.; but when the membership roll thereof was complete said branch was not in fact organized as a branch of the New Haven organization, but was in fact formed as a court or branch of the New York corporation in April, 1904, and under the supervision of the said Neary as an officer and agent of such New York corporation; that Neary acknowledged writing the letters, and that same are written upon the stationery of

the Daughters of Isabella, the New York corporation, and that the said Neary is designated thereon as territorial regent of said organization. She further says that Neary, as she verily believes, in January, 1904, was an officer and agent of the Daughters of Isabella of Utica, N. Y., and knew of the existence of the voluntary organization operating at New Haven, Conn. This, of course, tends to show that Neary knew there was a voluntary organization bearing the name "Daughters of Isabella" in Connecticut as early as 1904, but has no tendency to show any fraud or fraudulent practices on the part of Neary, or of the Utica corporation through any of its officers or members. Mrs. Booth was not present at the organization, and no affidavit from any source is produced indicating or tending to show that those who joined the Naugatuck organization supposed or were led to believe they were joining a branch or council of the Connecticut organization. Mrs. Booth then says that she is informed and verily believes that the court now attached to the National Order of the Daughters of Isabella at New Haven, Conn., known as Court Santa Marie, No. 40, etc., was organized in 1904, and formed a part of the complainant's organization, but was subsequently induced by officers and agents of the Utica corporation, of which Neary was an officer, to withdraw from the complainant's organization and affiliate with the defendant. This is mere information and belief, without even stating the source of such information and the grounds of such belief, and, even if true, it all relates to a Connecticut organization, and there is no statement that Neary, or any one else, made any false or fraudulent statements in inducing the Santa Marie branch to affiliate with the Utica branch. However that may be, the defendant was long ago enjoined from doing business in the state of Connecticut, and all Daughters of Isabella in that state are at liberty to affiliate with the Connecticut organization. Mrs. Booth further states that branches or circles of the Connecticut or National Circle to the number of 64 have been organized since she joined the organization, and that these have remained branches of the National Circle, "except in the cases of such circles as have been induced to withdraw and join the defendant organization, or such as have become defunct or withdrawn for other reasons, and that the National Circle now has in existence 46 circles, located in Connecticut, Rhode Island, Massachusetts, Illinois, Wisconsin, Indiana, Missouri, and other states of the United States."

The complainant has filed the affidavit of Josephine C. Curran, the secretary of the National Circle, and who knows where all existing circles are located, and I have already given the states in which they are located and the date of their organization. Mrs. Booth gives no instance where a circle has been induced to withdraw from the complainant organization and join the defendant organization, and even if such a thing has occurred there is no evidence before this court that such action was induced by false or fraudulent representations of any character. The affidavit of Mrs. Booth, while adding information on the subject, fails to strengthen in any way the claim of the complainant to the preliminary injunction prayed for.

The final judgment in the suit in equity brought in the state of Connecticut was rendered at the October term, in 1910, on appeal

from the decision of the court below. That was nearly six years ago and since that time, as already appears, the New York corporation has been operating and first establishing courts in at least 33 of the states of the Union without interruption. I do not find that the complainant corporation has any organization in the state of New York. There is no judgment of any court to the effect that the defendant organization has no right to operate in any state outside the state of Connecticut.

It is not necessary at this time to pass upon the question of complainant's laches, or its effect on the rights of these parties; but in view of the recent utterance of the Supreme Court of the United States, and of the absence of affidavits showing some acts of actual interference, or the making of some false or fraudulent statements or statement, it seems to me clear that the complainant has failed to make a case for the granting of a preliminary injunction. The action may be speedily tried, if the parties so will, and all the facts developed.

The motion for a preliminary injunction pendente lite is therefore denied.