SALVATION ARMY IN UNITED STATES v. AMERICAN SALVATION ARMY.

(Supreme Court, Appellate Division, First Department.    December 30, 1909.)

1. CORPORATIONS (§ 49*)—NAME—INFRINGEMENT.
    A charitable and benevolent society may maintain a suit to enjoin the use of its corporate name by another.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 137; Dec. Dig. § 49.*]

2. CORPORATIONS (§ 49*)—NAMES—INFRINGEMENT.
    The use of the words "Salvation Army" as a part of its corporate name by "The American Salvation Army," and its assumption of the physical attributes of its predecessor in the field, "The Salvation Army in the United States," with slight differences, being calculated to deceive, will be enjoined at the suit of the latter society.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 137; Dec. Dig. § 49.*]

3. CORPORATIONS (§ 49*)—INFRINGEMENT—ACTIONS—LACHES.
    Plaintiff having protested against defendant's use of the words "Salvation Army" as a part of its corporate name, and the title "War Cry" for its paper, a suit to enjoin the use begun eight months after defendant came into the state was not barred by laches, though defendant had operated in other states for more than 10 years.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 137; Dec. Dig. § 49.*]

Appeal from Special Term, New York County.

Action by the Salvation Army in the United States against the American Salvation Army. From a judgment dismissing the complaint (62 Misc. Rep. 360, 114 N. Y. Supp. 1039), plaintiff appeals. Reversed.

Argued before INGRAHAM, McLAUGHLIN, HOUGHTON, CLARKE, and SCOTT, JJ.

Frederick W. Garvin (D. Cady Herrick, of counsel, and George C. Lay, on the brief), for appellant.

Wilson Lee Cannon, for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CLARKE, J. The plaintiff sued to enjoin the defendant corporation from using the name American Salvation Army or a name so nearly resembling it as to be calculated to deceive the public and the friends, patrons, and adherents of the plaintiff; from using uniforms, insignia, or badges of office similar to and resembling the uniforms, insignia, or uniforms adopted and used by the officers of the plaintiff; from printing and publishing, selling, or offering for sale copies of a paper known as "The War Cry," or using the "War Cry" in connection with any publication issued by the defendant, and from printing postal cards and others literature in form resembling that used by the plaintiff; from making any representations leading the public to believe that the defendant, the American Salvation Army, is the plaintiff for the purpose of securing credit or subscriptions, contributions of money, and donations of real and personal property.

In or about the year 1878 William Booth, of London, England, a duly authorized minister connected officially with the religious body known as the "Methodist New Connection," for the purpose of conducting a religious, charitable, and benevolent work upon a military basis, organized a society which he called the "Salvation Army," in which the officers and members were given military titles, and were furnished with uniforms indicating rank and service. The members of said society recognized the said Booth as its general and its spiritual head, in whom was vested supreme control over the temporal and spiritual affairs of the society. In accordance with the laws of England, there was filed in the public record office in August, 1878, amended by a declaration dated June 24, 1880, a deed poll expressing the purposes of the society and its name. Gen. Booth originated and adopted the name, and was the first to apply the words "Salvation Army" to the conduct of a religious organization. In 1880 he sent to the United States of America a small band of followers, and established a branch of the Salvation Army in this country, and the movement gradually spread through the United States until in October, 1884, there were upwards of 80 posts in various states of the Union, with 300 officers and several thousands of soldiers or members. There are now 800 posts in existence in the United States with 4,000 or 5,000 officers, and embracing nearly 30,000 of private soldiers. It has established industrial and rescue homes of which there are 84 in this country. The Army depends for its support solely upon voluntary contributions. It has spread all over the world, and branches or posts have been established in all of the countries in Europe except Russia, in Australia, in India, and in other parts of Asia and Africa. These branches throughout the world are organized in the same manner as the original organization and on a military basis, and all recognize Gen. Booth as the supreme head and commander. In conducting the work of the Army, Gen. Booth issued a publication called the "War Cry" which was first published in England and was issued on the 27th of December, 1879, and a publication of said paper has continued down to the present time. It is the official organ, and records the work of the Salvation Army and is published weekly. The Salvation Army throughout the world has now 25 "War Crys" printed in 17 different languages with a combined circulation of over 50,000,000

copies per annum. The name "War Cry" was invented or coined by Gen. Booth, and was never before applied to any publication. The uniforms of the officers and members, both male and female, of the Salvation Army are distinctive.

Meeting much opposition and ridicule in its early days, the Salvation Army has come to be a great moral influence, and is now recognized as an important and efficient agency in the uplifting and betterment of the poor, degraded, and outcast members of society whom by its peculiar customs and methods it has been able to reach where other established religious organizations have for one reason or another failed. It was a unique, a picturesque, and a successful departure from older methods of dealing with the hopeless, the depressed, the debased, and the criminal elements of the community. It was known everywhere as "The Salvation Army," and was conducted in this country up to the year 1899 as a voluntary organization.

On April 28, 1899, a special charter was granted by the Legislature of the state of New York to the Salvation Army (chapter 468 of the laws of that year), and a certificate was filed in the office of the Secretary of State May 12, 1899. In and by the charter of the said Salvation Army in the United States it was provided that all the temporalities and property, real and personal, of any nature or kind, of the association known as the Salvation Army held in the United States by any officer or member thereof, should, on the incorporation thereof, become the temporalities and property of said corporation, whether the same were given, granted, or devised directly to such incorporated society or association, or to any person for its use and benefit. The purpose of the incorporation of the society in the United States was to better prosecute the temporal work thereof, to enable it to hold real estate in its own name, and to establish rooms and institutions of various kinds for the poor and the outcast, and to enable it to manufacture its own musical instruments and its own literature, uniforms, etc. The Salvation Army duly accepted the charter and organized a society in corporate form so far as it related to the temporal affairs and the powers expressly granted by the charter, and took possession of the temporalities and property formerly owned by the unincorporated association in the United States, and it became subject to and complied with all the provisions of the charter and the laws of the state, and all sales and mortgages of its real estate have been approved in all cases by the Supreme Court of the state of New York.

The defendant, the American Salvation Army, was incorporated August, 27, 1896, by the common pleas court, Dauphin county, Pa., and reincorporated in April, 1900, by the court of common pleas of Philadelphia county, Pa. It makes use of military titles, and its officers and members wear uniforms and insignia of office and rank. It has published irregularly a paper called first "The American War Cry," and now "American Salvation Army War Cry." It operates in 71 places in 12 states, and has about 300 officers and 2,500 members. Its largest post or church is at Coatesville, Pa., where it owns real property worth about $12,000. The Special Term in its findings of fact found that the defendant corporation organized its officers

and members into a military system and adopted uniforms for its male and female officers and members similar to those used by the plaintiff corporation and its predecessor, the unincorpórated association known as the Salvation Army; that the incorporation of the American Salvation Army on July 10, 1896, was the starting of an independent organization in no way connected in service or continuity with any previous movements, and was not a secession of members of the Salvation Army in the United States, but was the incorporation and forming of a new and independent organization; that many of the employés and agents of the defendant corporation have falsely represented themselves to be connected with and operating for the Salvation Army in the United States, the plaintiff corporation, and have received donations of money and clothing which were intended for the use of the plaintiff in this action. Eleven of such specific instances are set forth in the findings. Upon the suggestion of the learned court upon the trial that much of this evidence was cumulative, the plaintiff refrained from offering further instances, although it had served two bills of particulars setting up a large number of additional instances which it claims it was prepared to establish by proof, but refrained upon the suggestion of the court.

The defendant and its officers and agents did not operate in the state of New York prior to April, 1907. In the month of July, 1907, it had a post and industrial home in the borough of Brooklyn, which was closed up by the district attorney of Kings county and other public officials in Brooklyn on account of immorality, and the work was abandoned in the borough of Brooklyn. The summons and complaint in this case were served on the 27th of November, 1907. The Special Term found as a conclusion of law that the defendant has no prior right to the use of the words "Salvation Army" by reason alone of its incorporation prior to the incorporation of the plaintiff, but it dismissed the complaint upon the merits upon the ground that the plaintiff was not entitled to the relief demanded. It is so clear as to hardly justify discussion that the purpose of the defendant in assuming the names "American Salvation Army" for its organization and the "American War Cry" for its paper and its adoption of the military titles and the uniforms and its whole scheme of procedure was to take advantage of the long-established and widespread public knowledge of .the Salvation Army and to receive for itself whatever benefit might flow therefrom. While its object in organizing may have been entirely laudable, its assumption of the physical attributes of its predecessor in the field, with slight and colorable differences, was obviously an imitation, and calculated, if not deliberately designed, to deceive.

In Higgins Company v. Higgins Soap Company, 144 N. Y. 462, 39 N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769, the court said:

"It is well settled that an exclusive right may be acquired in the name in which a business has been carried on, whether the name of a partnership or an individual, and it will be protected against infringement by another who assumes it for the purposes of deception, or even when innocently used without right, to the detriment of another. * * * The cases are not infrequent in which the use of corporate names has been restrained on the principle of the trade-mark cases. * * * . But if the name was assumed in good faith, and without design to mislead the public and acquire the plaintiff's

trade, the defendant, knowing the facts, must be held to the same responsibility as if it acted under the honest impression that no right of the plaintiff was invaded. The names are not identical, but, as said by Bradley, J.. in Celluloid Company v. Cellonite Co. (C. C.) 32 Fed. 94, 'similarity, not identity, is the usual recourse where one party seeks to benefit himself by the good name of another.' "

In Colman v. Crump, 70 N. Y. 573, quoted with approval in Burt v. Smith, 181 N. Y. 1, 73 N. E. 495, in speaking of trade-marks the court said:

"If the false is only colorably different from the true, if the resemblance is such as to deceive a purchaser of ordinary caution, or if it is calculated to deceive the careless and unwary, and thus to injure the sale of the goods of the proprietor of the trade-mark, the injured party is entitled to relief. Neither is it necessary to establish a guilty knowledge or fraudulent intent on the part of the wrongdoer. It is sufficient that the proprietary right of the party and its actual infringement is shown. These general principles are well established."

The right to injunctive relief is not limited to business and trading corporations, but is given to charitable, benevolent, and patriotic societies. In Society of the War of 1812 v. Society of the War of 1812, 46 App. Div. 568, 62 N. Y. Supp. 355, Mr. Justice Patterson said:

"The right to injunctive relief depends upon the use by one party of a name or corporate designation of another, so as to interfere with its business, whatever it may be, not necessarily a commercial or trading business. * * * The principle upon which the court will interfere is that by the assumption of a name the business of one corporation may be injuriously interfered with or affected by the other. There is evidence here that the plaintiff has been injured by the defendant, although there is none of actual deception, but it is not necessary that actual deception should be shown. 'It is the liability to deception which the remedy may be invoked to prevent. It is sufficient if injury to the plaintiff's business is threatened, or imminent, to authorize the court to intervene to prevent its occurrence. [Taendsticksfabriks Akticbolagat Vulcan v. Meyers] 139 N. Y. 367 [34 N. E. 905].' It is sufficient that the plaintiff has a prior right; that the defendants have asumed a style and title which is substantially that of the plaintiff; that the plaintiff's business, or the purposes for which it was organized will be injuriously affected by the defendant continuing to use the title by which it was incorporated, and there has been no laches which would operate to prevent the plaintiff from receiving the aid of the court."

In International Committee v. Young Women's Christian Ass'n, 194 Ill. 194, 62 N. E. 551, 56 L. R. A. 888, the court said:

"The object, work, sources of support, and field of labor of each being substantially the same, and the name of appellee [the Young Women's Christian Association of Chicago] having been adopted and in use by it many years prior to the incorporation of the appellant [the International Committee of Young Women's Christian Association], the appellant had no right to adopt as its corporate name one so similar to that of appellee or to incorporate in its name words which would indicate to the public that it was the representative of appellee and the conference with which appellee is affiliated. In addition to the similarity of name, * * *' it clearly appears that such name was adopted by the appellant advisedly and for the purpose of leading the general public and the persons with whom it was likely to be associated and from whom it hoped and expected to obtain support by way of donations to believe that it stood as the committee and representative of the associations known as 'The Young Women's Christian Association,' then organized in the field where it expected to operate."

As the defendant did not come into the state of New York until April, 1907, and as it appears that the plaintiff strenuously. protested against its use of the name Salvation Army, and the title "War Cry" for its paper, and as it began this action in November of the same year in the courts of the state in which it had been incorporated, we cannot see that it has been guilty of such laches as to require a court of equity to deny it relief.

We think there are enough findings of fact in the decision of the Special Term to establish plaintiff's right to a judgment, and that inconsistent findings in favor of the defendant are not supported by the evidence. It follows, therefore, that the judgment appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event. All concur.