## NATIONAL CIRCLE, DAUGHTERS OF ISABELLA, v. NATIONAL ORDER OF DAUGHTERS OF ISABELLA.

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

### No. 56.

1. **Judgment ⬤⟳665—Conclusiveness of findings not affected because there were other parties in earlier suit.**

   In a suit between fraternal beneficiary corporations, the conclusiveness of findings made in an earlier suit to which plaintiff and defendant were parties was not affected because subordinate branches or lodges were joined as plaintiff and defendants in the earlier suit.

2. **Judgment ⬤⟳714(2)—Findings held conclusive in similar suit, though cause of action was different.**

   The findings in a suit by a fraternal beneficiary corporation to enjoin the use of a similar name by another in the state of Connecticut, as to priority in the use of such name, and complainant's succession to the rights of a voluntary association first using it, were conclusive in a subsequent suit to restrain defendant from using such name anywhere in the United States.

3. **Corporations ⬤⟳49(2)—Evidence held to warrant finding of plaintiff's prior use of corporate name.**

   In a suit by one fraternal beneficiary corporation to enjoin another from using the same name, evidence *held* to warrant a finding that the name was first used by a voluntary association to whose rights complainant had succeeded.

4. **Corporations ⬤⟳49(2)—Fraternal corporations entitled to sue to enjoin use of name by others; "charitable corporation"; "eleemosynary corporation."**

   Fraternal beneficiary corporations organized and carried on for the mutual benefit of their members, and not for profit, and having no capital stock, but collecting assessments out of which payments are made upon the death or disability of members to designated beneficiaries, are not charitable or eleemosynary corporations and are entitled to have the use of the same or a similar name by another enjoined whether or not the law of unfair competition applies to charitable or eleemosynary corporations.

   [Ed. Note.—For other definitions, see Words and Phrases, Second Series, Charitable Corporation; First and Second Series, Eleemosynary.]

5. **Corporations ⬤⟳49(2)—Right to enjoin use of name by another may be asserted in any state where corporation does business.**

   That an incorporated fraternal order was organized and incorporated in Connecticut does not restrain its right to protection against the use of its name by another order to such state and its right to protection may be asserted under proper conditions in any state in which it is permitted to conduct its business.

6. **Corporations ⬤⟳49(2)—Fraternal society adopting another's name not entitled to use it because first incorporated.**

   A fraternal order adopting the same name used by a voluntary association acquired no additional right to the use of the name because it was incorporated before the incorporation of such association.

7. **Trade-marks and trade-names ⬤⟳21—Right ordinarily depends on priority of appropriation.**

   In the absence of exceptional circumstances, the exclusive right to a trade-name or trade-mark is founded upon priority of appropriation.

8. **Equity ⬤⟳67—Rights may be lost by laches.**

   A right may be waived or lost by failure to assert it at a proper time.

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. **Equity ⊚⟳71(1)—Laches not measured by days or months.**

The doctrine of estoppel by laches is not one which can be measured in days and months as though it were a statute of limitations.

10. **Equity ⊚⟳80—Laches not defense in case of fraud.**

In cases of fraud the defense of laches does not appeal to the conscience of the chancellor.

11. **Corporations ⊚⟳49(2)—Fraternal corporation held not to have lost rights to protection of name by laches.**

An incorporated fraternal order *held* not to have lost its right to protection against the use of its name by another similar order by delay in asking relief.

12. **Corporations ⊚⟳49(2)—Right of fraternal corporation to enjoin use of name not affected by large number of branches organized by defendant.**

Where defendant, a fraternal order, adopted the same name as a voluntary association to whose rights complainant had succeeded, the large number of branches organized by defendant or the fact that it had more branches than complainant did not defeat complainant's right to an injunction against the use of the name, as the branches had no rights or equities superior to those of the organization of which they were a part.

Appeal from the District Court of the United States for the Northern District of New York.

Suit by the National Circle, Daughters of Isabella, against the National Order of the Daughters of Isabella. From a decree for defendant (252 Fed. 815), complainant appeals. Reversed, with directions. Certiorari denied 254 U. S. ——, 41 Sup. Ct. 376, 65 L. Ed. ——.

Mills & Mills, of Albany, N. Y. (Charles F. Roberts, of New Haven, Conn., and Howard F. Landon, of Salisbury, Conn., of counsel), for complainant.

P. H. Fitzgerald, of Utica, N. Y., for defendant.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This case presents the question whether the complainant is entitled to enjoin the defendant and all its subordinate branches and lodges from using the name "Daughters of Isabella."

The complainant and the defendant are composed of women of the Catholic faith, and they are organized for religious and fraternal purposes. The complainant's charter states that:

"The objects and purposes of said corporation shall be to render pecuniary aid and assistance to sick and distressed members and to the beneficiaries of members whether such sickness be temporary or incurable, and to render pecuniary aid toward defraying the funeral expenses of members, and to promote social and intellectual intercourse among its members."

The particular objects for which the defendant was incorporated as stated in its certificate for incorporation are:

"A. For the purpose of promoting the social and intellectual standing of its members.

"B. For literary purposes.

"C. For the purpose of rendering such aid and assistance among its members as shall be desirable and proper, and by such lawful means as to them shall seem best."

---

⊚⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes'

The defendant was incorporated on June 24, 1903, under the name "Daughters of Isabella," and in June 1905 it petitioned the Supreme Court of the state of New York to change its name to "The National Order of the Daughters of Isabella." Its petition was granted on August 7, 1905.

The defendant's articles of incorporation contain no express provision for the establishment of branches.

The incorporation of the Connecticut association on March 7, 1904, contained no provision for the establishment of branches. But its articles of incorporation were amended on November 5, 1904, and as amended the power was obtained to establish branches in Connecticut and elsewhere.

The complainant's charter, granted on July 25, 1907, reads as follows:

"Said corporation shall have power to locate and establish state and district circles, local or subordinate circles, or other branches or divisions thereof under the name of Daughters of Isabella, composed of members of the order in any town or city in this state or in any other state of the United States, or in any other country, and said state, district, or local circles, or other branches or divisions, when so established, shall be governed and managed by such laws, by-laws, rules, and regulations against any such state, district, or local circle or circles, or other branches or divisions in any court of this state or of any other state in the United States, and said corporation may grant charters to such state, district, or local circles, or other branches or divisions, and may authorize such state, district, or local circles to make subject to the approval of the national or some authorized officer thereof, such local by-laws as the needs of any state, district, or local or subordinate circle, or other branch or division may seem to require."

The defendant soon after its incorporation began to organize subordinate lodges or branches in different states. It had at the time this case was considered below some 300 branches or courts with a membership of some 25,000.

The complainant in this case alleges in substance that the defendant upon its incorporation in the state of New York appropriated a name similar to that of a then existing voluntary association in the state of Connecticut, which was the predecessor in title and interest of the complainant, and adopted a ritual, odes, and ceremonies substantially similar to those in use by such voluntary organization and which were later adopted and used by the complainant. It is also alleged that defendant has established and is creating local branches or lodges using the words "The Daughters of Isabella," which are the words used by the complainant in designating its branches or councils, and that this has caused great confusion and uncertainty in the minds of many persons and has deceived many inducing them to join with the latter's branches under the belief that they are the branches of the complainant. The complaint asks an injunction restraining the defendant from establishing any further branches in any part of the United States under the name "Daughters of Isabella," and of any name so similar thereto as to be likely to deceive or induce persons to join or treat with it as the complainant, and it also seeks to restrain and enjoin the defendant and all its subordinate branches and lodges from using or continuing to use such name or any name so similar thereto as to be likely to

create confusion, or to deceive the public or to induce persons to join or treat with the same as the complainant. And an accounting of damages and loss of income and profits is asked.

It appears that in May, 1897, at New Haven, Conn., there was organized a voluntary secret fraternal benefit association by women of the Catholic faith under the name of "The Ladies' Auxiliary of Russell Council, No. 65, Knights of Columbus." That from the time of its formation the members called each other "Daughters of Isabella." The organization adopted a constitution and a ritual. In 1898 the association appointed a committee to consider the matter of incorporating under the name "Daughters of Isabella," but took no further action at that time. In 1901 the association adopted, and its members began to wear, a society pin on which appeared letters and symbols indicating "Daughters of Isabella" and by that name the members were commonly known among themselves and to the public. This association was incorporated on March 7, 1904, under the laws of the state of Connecticut, and under the name "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus." The aforesaid corporation was organized by the members of the original voluntary association, and it adopted the same constitution, used the same ceremonies, ritual, songs, society pin, and insignia, and continued to carry out the plans and purposes of the original voluntary association, and to use and be known by the name of "Daughters of Isabella." It was the successor in title and in all other respects to the rights of the original voluntary association, including the right to use the name "Daughters of Isabella." In November, 1904, its articles of incorporation were amended and it was empowered to establish branches under the name of "Daughters of Isabella." By a special act of the General Assembly of the state of Connecticut, approved on July 25, 1907, all of the incorporators named in the articles of incorporation of March 7, 1904, were on their application and the application of the subordinate branches granted a charter incorporating them under the name of "The National Circle, Daughters of Isabella," with power to establish branches within the state and elsewhere. And this second corporation used substantially the same ceremonies, ritual, songs, society pin, and insignia, and continued to carry out the purposes of the first corporation. The National Circle, Daughters of Isabella, has continued ever since to be the successor to all the rights and privileges of the original voluntary association including the right to the use of the name "Daughters of Isabella."

It also appears that as early as the year 1899 the National Secretary of the Knights of Columbus was receiving from time to time inquiries from various sections of the country regarding the "Daughters of Isabella," and that such inquiries were referred by him to the officers of the voluntary association at New Haven already referred to. Prior to the organization of the defendant one Michael F. Kelly of Utica, N. Y., was at New Haven, and there discussed with the National Secretary of the Knights of Columbus the voluntary association of the Catholic women that there existed, and obtained from him the name of its presiding officer, and from her he obtained copies of the ritual and in-

stallation exercises then being used by such voluntary association. Later Kelly was instrumental in organizing the Catholic women of Utica into the defendant organization under the name "The Daughters of Isabella" which was incorporated on June 24, 1903, under the laws of the state of New York. He furnished to the New York corporation the basic idea of that organization, which, on its petition to the Supreme Court of the state of New York, had its name changed on and after September 15, 1905, so that it should be thereafter known as "The National Order of the Daughters of Isabella." This corporation is not under its articles of incorporation, expressly empowered to organize or institute subordinate lodges or courts or branches, but it has nevertheless done so in various states.

It appears that the New York organization prior to April 4, 1904, had no branch or court in the state of Connecticut, but on that date it established a branch at Naugatuck in that state. Some time in April or May of that year the New York corporation, defendant herein, applied to the Secretary of State in Connecticut for leave to file a copy of its articles of association preliminary to its beginning business in that state and was refused because of the practical identity of its name with that of the Connecticut corporation. In January, 1905, it applied to the General Assembly of Connecticut to incorporate it in that state under the name "National Order, Daughters of Isabella," and the application was refused. Then in September, 1905, the Supreme Court of New York having in June of the same year granted it permission to change its name to National Order of the Daughters of Isabella, it filed a certificate of its articles of incorporation with the Secretary of State in Connecticut. Then it established a number of courts in that state, including a "state court." Thereupon, and on October 21, 1907, a complaint was filed in the superior court at New Haven, Conn., and an injunction was asked restraining the defendant from establishing any further branches in that state under the name and title of "Daughters of Isabella," and it was also asked that defendant's existing subordinate branches within the state be restrained from using that name or title. That court awarded the injunction, and on appeal to the Supreme Court of Errors the order was affirmed. The Supreme Court in speaking of the complaint said:

"But the complaint does not ask that the New York corporation be enjoined from using its corporate name. It asks that it be restrained from establishing any further branches in this state under the name and title of 'Daughters of Isabella,' and that its existing subordinate branches within the state be restrained from using that name or title. The injunction was asked and granted upon the ground that this distinctive portion of the plaintiffs' name was being used by the defendants to the plaintiff's injury, to the confusion of their business, and so as to deceive the public, and not upon the ground that the two names were identical. The words 'Daughters of Isabella' are the distinctive words in the name of each of the corporations. They are common to all of them, and are the ones by which the public designates the members of the different corporations. Whether such members belong to the National Circle * * * or subordinate circles, is a matter which concerns the members only. To the public they are all Daughters of Isabella. The finding makes it clear that the plaintiffs first adopted these words as distinctive of their association and activities, and that they and the voluntary

association out of which they grew were using them several years before the defendant was organized. The New York corporation found the plaintiffs here using the name in pursuing their objects and purposes when it first came to this state and sought permission to do business here under the same name. After its change of name the court finds that, with full knowledge of the plaintiffs' rights and of the injury and loss that must result to them from the establishment here by the defendant of subordinate branches, it proceeded to establish such branches, and is threatening to establish others under the name 'Daughters of Isabella.' To thus appropriate and use the distinctive portion of the plaintiffs' name was in effect to appropriate their name. *. * * The court finds that the effect of this use of the name by the defendants has been, as alleged in the complaint, to cause confusion and uncertainty in the plaintiffs' business, to injure them pecuniarily and otherwise, and to deceive and mislead the public. In such a case an injunction lies in favor of the corporation first using the name to restrain another corporation thus attempting to appropriate and use it." Daughters of Isabella No. 1 v. National Order, Daughters of Isabella, 83 Conn. 679, 78 Atl. 333, Ann. Cas. 1912A, 822.

[1] In that action the present complainant, the National Circle, Daughters of Isabella, was one of the plaintiffs and the present defendant, the National Order, Daughters of Isabella, was one of the defendants. The fact that there was associated with the present plaintiff a branch known as "Daughters of Isabella No. 1" and with the defendant certain branches established by it within the state of Connecticut is immaterial so far as any question now before us is concerned.

[2] The District Judge in the present suit in making his findings was in error when he declined to find as follows:

"The issue of fact as to the priority of the use of the name and title 'Daughters of Isabella' by the predecessor in interest of the complainant here, raised in the said action in said superior court, and the issue of fact as to the succession of interest and title by the complainant here, from the original user of the said name and title, raised in the said action in said superior court, were the identical issues of fact as to such priority of use and as to such succession raised by the pleadings in the above-entitled action."

The learned District Judge, in referring to the Connecticut judgment, stated that—

"It settled and settles forever the rights of the parties in that state and no other."

We admit that the cause of action in that case is not identical with the one alleged in the instant case. We admit that the judgment in that case only enjoined the defendants from using the name "Daughters of Isabella" within the state of Connecticut. But we do not agree that the Connecticut action settled nothing which can in any way affect the rights of the parties in the present suit.

The findings of the Connecticut court are conclusive upon the parties to that litigation, and they are as conclusive outside of Connecticut as they are inside of the state. And one of the issues of fact which it conclusively determined was that the Connecticut organization used the words "Daughters of Isabella" for several years before the defendant was organized. And another issue of fact which it in substance determined was that the present plaintiff is the successor of the voluntary association which in 1901 appropriated the name "Daughters of Isabella."

The Connecticut court was not asked to restrain the defendant from the use of its name outside of that state or from establishing branches outside of the state of Connecticut, so that the decision then rendered was not intended to restrain and did not restrain the defendant from doing the things complained of in the present suit. The present action seeks to restrain the defendant from doing anywhere in the United States what the Connecticut court restrained it from doing in that state. But the findings of fact in the Connecticut action, in which the present plaintiff and the present defendant were parties plaintiff and parties defendant, must be regarded as res adjudicata between them. The findings of the court as to the essential facts are conclusive between the parties in all subsequent judicial proceedings so long as the judgment remains unmodified. They are not only final in the state where the judgment was rendered, but they are final in every other state.

As expressed by Lord Hardwicke in Gregory v. Molesworth, 3 Atkyns. 626, in 1747, when a question is necessarily decided in effect, though not in express terms, between parties to the suit, they cannot raise the same question as between themselves in any other suit in any other form. And in Southern Pacific Railroad Co. v. United States, 168 U. S. 48, 49, 18 Sup. Ct. 18, 27 (42 L. Ed. 355), it was said:

"Even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified."

See too, Forsyth v. Hammond, 166 U. S. 518, 17 Sup. Ct. 665, 41 L. Ed. 1095; Hartford Life Ins. Co. v. Ibs, 237 U. S. 673, 35 Sup. Ct. 692, 59 L. Ed. 1165, L. R. A. 1916A, 765; Bates v. Bodie, 245 U. S. 520, 526, 38 Sup. Ct. 182, 62 L. Ed. 444, L. R. A. 1918C, 355.

[3] We may say that, if the question of priority of use were still an open one, we should have no difficulty upon the present record in reaching the conclusion that the name "Daughters of Isabella" was first used by the Connecticut voluntary association.

There is considerable testimony in the record to show that in February, 1898, the voluntary association of the Daughters of Isabella had a social meeting in New Haven which was attended by a Mr. Kelly, who later organized the defendant corporation under the laws of New York. The testimony is that Kelly spoke at this meeting and asked the aid of the members present in establishing the Daughters of Isabella at Utica. Four of the women present on that occasion testified quite positively to his presence and three of them as to what he said. It does not seem to us probable either that they are mistaken or that they testified falsely. The Supreme Secretary of the Knights of Columbus[1] for 25 years, Daniel Colwell, testified as follows:

"I recall Mr. Kelly paying a visit here to New Haven some years ago in connection with the Daughters of Isabella; it was a visit of inquiry. I had received as secretary of my own society innumerable letters inquiring about the Daughters of Isabella and how they could be reached; it was my custom

---

[1] The Knights of Columbus was organized in 1885. Its membership is drawn from men of the Catholic faith. It is an organization for social, educational, and other purposes.

to refer them to the officers of the society, and particularly to Miss Kennedy, the head of the order, and I frequently turned the whole correspondence over to her, and at other times I answered the letters and referred the original writer to Miss Kennedy. I think very likely I referred Mr. Kelly to Miss Kennedy for information about the order. I don't recall but one conversation with Mr. Kelly about the order. That was at my office in Chapel street, when I was secretary of the Knights of Columbus. At this particular time he came to learn the method of establishing a council of the Daughters of Isabella in Utica. I could not fix the year. This conversation between Mr. Kelly and I took place long before the establishment of the Daughters of Isabella in Utica. I referred Mr. Kelly to Miss Kennedy. I gave him a copy of the ritual which I had prepared for the Daughters of Isabella in New Haven. I know Mr. Kelly was intent upon the establishment of the Daughters of Isabella in Utica, and I assumed and supposed that it was part of the organization here. If I supposed it was intended for a separate organization he could not have got the ritual from me for $10,000. Mr. Kelly suggested to me that I would furnish him with the ritual. I did so, including the songs and odes, and Mr. Kelly told me he would pay me for it, and Mr. Kelly kept his word and paid me for it. The society we were talking about was called the Daughters of Isabella and passed between us as common as 'How do you do' to-day, or "Good-by' to-morrow. I do not recall any occasion on which I was present at a meeting of the organization in the Wood's building at which Mr. Kelly was present."

The last reference is to the social meeting already referred to which it is said that Mr. Kelly attended. The latter denies that he was present at the meeting, or that he ever addressed any such meeting and expressed a wish to have the members go to Utica and establish the Daughters of Isabella. His testimony is:

"I never said, I hoped to have the ladies go to Utica, and establish Daughters of Isabella there. In 1897 or 1898 I did not or had not from any source heard the words 'Daughters of Isabella' as applied to any organization. I first heard the words 'Daughters of Isabella' as applied to an organization when I used it myself late in 1901 or early in 1902."

It is impossible to reconcile his testimony with that of the other testimony in the record. Some one is mistaken, and, while we do not believe that Mr. Kelly intentionally misstated the facts, we think that he is mistaken in his recollections. He was instrumental in organizing the association at Utica in 1903, and in having it incorporated under a name containing the words "Daughters of Isabella." While it is claimed that the persons who formed that corporation were not aware at the time of the existence of another organization under the name "Daughters of Isabella," we think it improbable that such was the fact.

[4] In Creswill v. Knights of Pythias, 225 U. S. 246, 260, 32 Sup. Ct. 822, 56 L. Ed. 1074, the court stated that a conflict in the decisions existed as to whether in controversies over the right to use the name as between such organizations as the Knights of Pythias, for example, the court below was right in applying the rules applicable to trade-marks and trade-names and unfair competition in trade. The court in that case refrained from any discussion of the question. It is true that some difference of opinion exists as to whether eleemosynary or charitable corporations having nothing to sell and which do not make money are beyond the protection of the law of unfair competition. The question whether distinct identity may often be as important to such corporations and whether their interest in their names may be as definite and specific

as though they were engaged in commercial undertakings is not before us in the instant case, and we make no intimations concerning it. The parties to the present suit are not eleemosynary or charitable corporations. The complainant and the defendant are fraternal beneficiary corporations without capital stock. They are organized and carried on for the mutual benefit of their members, and not for profit. They are nevertheless business corporations, collecting from their members certain assessments out of which payments are made upon the death or disability of members to the designated beneficiaries. In this respect they resemble life insurance companies. The law of unfair competition applies to them. Such corporations have a right in their name, and equity in proper cases will enjoin another from the use of the same name or one so similar to it as to mislead the public. Wherever the name is calculated to deceive or tends to confusion the use may be enjoined. Von Thodorovich v. Franz-Josef Benevolent Association (C. C.) 154 Fed. 911. The right to injunctive relief against the improper use of a corporate name is, by many of the courts, not limited to corporations engaged in business and trade, but it extends to charitable, religious, benevolent, and patriotic societies. Society of 1812 v. Society of 1812, 46 App. Div. 568, 62 N. Y. Supp. 355; Salvation Army in the United States v. American Salvation Army, 135 App. Div. 268, 120 N. Y. Supp. 471; Benevolent and Protective Order of Elks v. Improved and Benevolent Order of Elks of the World, 205 N. Y. 459, 98 N. E. 756; International Committee, Y. W. C. A., v. Young Women's Christian Association, 194 Ill. 194, 62 N. E. 551, 56 L. R. A. 888.

[5] It must be conceded that the name of any organization, whether a voluntary association or of a corporation, if engaged in business, is, like that of a trade-mark, not necessarily limited in its enjoyment by territorial bounds. The fact that the plaintiff herein is a Connecticut organization does not in itself restrict its right to the protection of its name to the confines of that state. But its right to protection may be asserted under justifying conditions in every state in which it is permitted to conduct its business.

[6] Importance cannot be attached to the fact that the defendant was incorporated first. The mere incorporation of an organization under a particular name does not add anything to its right to use the name as against another organization unincorporated and already using the same or a similar name. Salvation Army in the United States v. American Salvation Army, supra; Grand Lodge of the Ancient Order of United Workmen of Iowa v. Graham, 96 Iowa, 592, 65 N. W. 837, 31 L. R. A. 133.

In Nims on Unfair Competition (2d Ed.) p. 163, it is well said that the fact that the defendant corporation, in a suit for unfair competition involving its name, has been chartered by some state government, does not afford it a defense or immunity from action against it in a federal court or state court by a corporation of another state, where the name adopted is used to compete unfairly with the complainant company. And see Peck Bros. & Co. v. Peck Bros. Co., 113 Fed. 291, 51 C. C. A. 251, 62 L. R. A. 81; Ft. Pitt Building & Loan Association, etc., v. Model Plan Building & Loan Association, 159 Pa. 308, 28 Atl. 215. The writer

already quoted, Nims on Unfair Competition, p. 62, also says that a corporate name is chosen by the incorporators themselves, and that, that being the case, their responsibility for its use is greater than in the case of their own personal names.

"Incorporators of a company," he says, "choose a name at their peril. They will be presumed to know the names under which the probable existing competitors of the new company are doing business. The choice of a name colorably similar to that used by a competitor is evidence of fraud, especially if it is likely that the new corporation will profit by the confusion that will result from the similarity between its names and that of a competitor."

[7] In many cases the exclusive right to a trade-name or to a trade-mark is founded upon priority of appropriation. In the ordinary case of parties competing under the same name or mark in the same market prior appropriation settles the question of the right. There are exceptional circumstances when the question of prior appropriation appears legally unimportant. Hanover Milling Co. v. Metcalf, 240 U. S. 403, 415, 36 Sup. Ct. 357, 60 L. Ed. 713. But in the present suit the exceptional circumstances referred to in the Hanover Milling Case are not disclosed.

[8, 9] A right may be waived or lost by failure to assert it at a proper time. Atlantic Coast Line Railroad v. Burnette, 239 U. S. 199, 36 Sup. Ct. 75, 60 L. Ed. 226; Burnet v. Desmornes, 226 U. S. 145, 33 Sup. Ct. 63, 57 L. Ed. 159. But, as was said in Northern Pacific Railway Co. v. Boyd, 228 U. S. 482, 509, 33 Sup. Ct. 554, 562 (57 L. Ed. 931), the doctrine of estoppel by laches is not one which can be measured out in days and months, as though it were a statute of limitations. "For what might be inexcusable delay in one case would not be inconsistent with diligence in another, and, unless the nonaction of the complainant operated to damage the defendant or to induce it to change its position, there is no necessary estoppel arising from the mere lapse of time. Townsend v. Vanderworker, 160 U. S. 171, 186."

[10] In cases of fraud the defense of laches does not appeal to the conscience of a chancellor. In Bowen v. Evans, 2 H. L. 257, a bill was filed to set aside, on the ground of fraud, a sale of lands under a decree nearly 50 years before. Lord Chancellor Cottenham observed:

"So, when much time has elapsed since the transaction complained of, there having been parties who were competent to have complained, the court will not, upon doubtful or ambiguous evidence, assume a case of fraud, although upon fraud clearly established no lapse of time will protect the parties to it, or those who claim through them, against the jurisdiction of equity depriving them of the fruits of their plunder."

In McIntire v. Pryor, 173 U. S. 38, 59, 19 Sup. Ct. 352, 43 L. Ed. 606, the Supreme Court did not wish it to be understood as holding that even in the case of actual fraud there could be indefinite delay in instituting proceedings. The intimation was that laches depends upon whether under all the circumstances of a particular case the plaintiff is chargeable with a want of due diligence.

In Saxlehner v. Eisner, 179 U. S. 19, 39, 21 Sup. Ct. 7, 14 (45 L. Ed. 60) the court said:

"But in cases of actual fraud, as we have repeatedly held, notably in the recent case of McIntire v. Pryor, 173 U. S., 38, the principle of laches has but

an imperfect application, and delay even greater than that permitted by the statute of limitations is not fatal to plaintiff's claim."

In McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, which was a suit for the infringement of a trade-mark, the right to an injunction was upheld, although tnere had been a delay of about 20 years in instituting proceedings. On account of the unreasonable delay in bringing the suit the complainant was denied the right to an account for profits.

In Menendez v. Holt, 128 U. S. 514, 523, 9 Sup. Ct. 143, 145 (32 L. Ed. 526), an attempt was unsuccessfully made to have the doctrine of McLean v. Fleming reconsidered. In declining to modify it the court, speaking through Chief Justice Fuller, said:

"The intentional use of another's trade-mark is a fraud; and, when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence then in the use is not innocent; and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired, by that negligence, the right to cut down the remainder (Attorney General v. Eastlake, 11 Hare, 205); nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right (Fullwood v. Fullwood, 9 Ch. D. 176). Acquiescence to avail must be such as to create a new right in the defendant. Rodgers v. Nowill, 3 De G., M. & G. 614. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs: it is, in reality, no more than a revocable license.' Duer, J., Amoskeag Mfg. Co. v. Spear, 2 Sandford (N. Y.) 599; Julian v. Hoosier Drill Co., 78 Indiana, 408; Taylor v. Carpenter, 3 Story, 458; s. c., 2 Woodb. & Min. 1."

In O'Brien v. Wheelock, 184 U. S. 450, 493, 22 Sup. Ct. 354, 370 (46 L. Ed. 636), the court said:

"The doctrine of courts * * * to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time is thoroughly settled. Its application depends on the circumstances of the particular case. It is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief."

In Creswill v. Knights of Pythias, supra, it was held that the doctrine of laches applies to the use of a name of a fraternal corporation, and that equity will not grant relief against the use of the name by parties who had been using it for many years without objection, at the instance of the older organization; there not appearing to be any fraud or intent to deceive the public. In that case a voluntary association known as the Knights of Pythias composed of white members only was organized in the District of Columbia as early as 1864. A few years later it became incorporated under a general incorporation act of the District, adopting the name Supreme Lodge, Knights of Pythias, and in 1894 it received a special charter from Congress. In 1880 an order of the Knights of Pythias to which black members only were eligible was formed in Mississippi. It became a corporation in the District of Co-

lumbia in 1889, by virtue of a general incorporation act, under the name of the "Supreme Lodge, Knights of Pythias, North and South America, Europe, Asia and Africa." About 1908 an application for an injunction to prevent the use of the name by the defendant was asked. The right to the injunction was sustained in the Supreme Court of Georgia, which was reversed by the Supreme Court of the United States on the ground of laches; it being stated to the court by counsel for the defense that the complainant had uttered no word of complaint for over a quarter of a century. And in that case, as already stated, there was no fraud. The facts in that case are therefore readily distinguishable from the facts in this.

And in Nims on Unfair Competition (2d Ed.) § 411, that writer says:

"The doctrine of laches as to stale claims in matters of trust does not apply in full force to unfair competition cases, where acquiescence will not usually be inferred, and, even if at one time the facts would justify a presumption of such acquiescence, there still exists in the first user a right of revocation of such acquiescence."

[11] In our opinion the complainant has not lost its right to the protection of its name by its delay in asking the relief it now seeks. Its right rests on the principle stated by Chief Justice Fuller above quoted that, where consent to the use of a name is to be inferred from knowledge and silence, such consent lasts no longer than the silence from which it springs. Moreover, in cases of fraud the question of laches does not strongly appeal to the conscience of a chancellor.

[12] We do not attach controlling importance to the fact that the defendant has organized a large number of branches under the name "Daughters of Isabella," or that it has a larger number of branches than the complainant. The branches are parts of the parent organization and can have no rights or equities in the name which are superior to the rights and equities of the organization of which they are a part.

Those branches which are in Connecticut are already known as "The Daughters of Castile," and if it becomes necessary for the remaining branches to adopt the same name or some name dissimilar to that of complainant, the fault is that of the defendant, whose improper conduct has occasioned it. If damage is suffered by the defendant corporation by being compelled now to change its name and cease its infringement on the plaintiff's name, the loss arises out of the defendant's own folly in deliberately incorporating under a name already in use.

Under all the circumstances and the delay which has occurred there is no right to an accounting.

The decree is reversed, and the District Court is directed to issue an injunction as prayed.