## KNIGHTS OF THE KU KLUX KLAN v. INDEPENDENT KLAN OF AMERICA.

(District Court, D. Indiana, Indianapolis Division. March 31, 1926.)

1. **Beneficial associations ⊜4—Knights of the Ku Klux Klan held entitled to enjoin another's use of name "Independent Klan of America," or similar names.**

Knights of the Ku Klux Klan *held* entitled to injunction against another organization's use of name "Independent Klan of America," or similar or like name or names.

2. **Beneficial associations ⊜4—Showing of probable confusion is sufficient to justify injunctive relief against another's use of deceptively similar name.**

Proof that confusion will probably follow is sufficient, without proof of actual confusion, to justify injunctive relief against organization's use of name deceptively similar to name previously adopted by another.

3. **Beneficial associations ⊜4.**

Organization need not be engaged in business or trading to be entitled to injunctive relief against another's use of deceptively similar name.

4. **Beneficial associations ⊜4—First user of name is entitled to injunctive relief, where names are so similar as likely to result in confusion.**

Exclusive right to use name is based on priority of use, and, when names are so similar as to likely result in confusion, courts will give injunctive relief to first user.

5. **Beneficial associations ⊜4.**

That defendant has been incorporated and chartered under name, use of which is sought to be enjoined, does not afford it any defense or immunity.

11 F.(2d)—56

6. **Evidence ⊜5(1).**

Courts take judicial notice of what is common knowledge among mankind.

7. **Evidence ⊜22(1).**

Courts judicially know that word "Klan" designates the Knights of the Ku Klux Klan, and word "Klansmen" the members thereof.

8. **Beneficial associations ⊜4—Plaintiff, suing to enjoin another's use of deceptively similar name, held not guilty of laches.**

Ku Klux Klan, instituting suit on February 18, 1925, to enjoin use of similar name by another organization, incorporated March 7, 1924, *held* not guilty of laches.

9. **Beneficial associations ⊜4.**

There can be no laches in another's use of name similar to plaintiff's name without acquiescence, and no acquiescence without knowledge.

10. **Beneficial associations ⊜4.**

That damages will result to organization enjoined from using name similar to that of another organization is not of controlling moment.

In Equity. Suit by the Knights of the Ku Klux Klan against the Independent Klan of America. Decree for plaintiff.

W. F. Zumbrunn and John H. Connaughton, both of Washington, D. C., and Chester L. Zechiel, of Indianapolis, Ind., for plaintiff.

Clarence Benadum and William H. Schreiber, both of Muncie, Ind., for defendant.

SLICK, District Judge. [1] Plaintiff brings this action to enjoin defendant from operating as a fraternal, ritualistic, secret order under the name of the "Independent Klan of America," the "Knights of the Ku Klux Klan," the "Invisible Empire, Knights of the Ku Klux Klan," the "Ku Klux Klan," or the "Klan," or any similar or like name, and alleges that defendant is engaging in unfair competition, in that its operations tend to confuse the public.

Defendant replies that it is a corporation organized under the laws of the state of Indiana, and has a charter issued by the secretary of state of the state of Indiana; that the word "Klan" is one of general use in the United States, and that the organization known as the Ku Klux Klan came into being in 1865, and was disbanded in 1876, and has never been revived.

Defendant also claims that plaintiff knew as early as March 7, 1924, that defendant had been authorized by the state of Indiana to assume this corporate name, and never did anything or took any steps to stop defend-

ant until the 18th day of February, 1925, when this action was begun, and that during the interim defendant expended large sums of money for advertising, letter heads, stationery, paraphernalia, and documents, and for this reason plaintiff should be estopped from proceeding in this cause in equity.

Defendant further alleges in its answer that plaintiff organization is based upon opposition to Catholicism and Judaism, and is devoted to the promotion of the Protestant white American native-born citizen, and that these principles are different from those of the original Ku Klux Klan organization, which was active during the reconstruction period following the Civil War, and different from the defendant herein, and that the principles of the plaintiff are more nearly parallel to the principles of the Society of Native-Born Americans, also called the 1776 Association, but usually known as the Know-Nothing Party, and that plaintiff organization is more nearly like the American Protective Association of 1876, usually referred to as the A. P. A., and that defendant has always stressed to the public the difference between its principles and those of the plaintiff, and has therefore enlightened or attempted to enlighten the public at large, instead of seeking to make fraudulent representations as claimed by plaintiff.

In addition to its answer, defendant filed a motion to dismiss, and the answer and motion were submitted together. Trial was had on the 22d day of January, 1926, and the cause was submitted without argument; counsel on both sides to file briefs within a reasonable time.

The evidence in this case is very simple and on most important points there is very little conflict. A brief statement of the salient features may not be amiss:

Plaintiff was organized as a corporation under the laws of the state of Georgia in 1916, and gradually extended its operations through the South, and in 1922 was operating in 48 different states, the Canal Zone, and the territory of Alaska. At its inception it was known as "The Klan," and it is generally known throughout the entire United States as "The Klan." Its local units are known as "klans," and its members are known as "klansmen." States are known as "realms," parts of states are known as "provinces," and the smallest unit in a state is known as a "klan." At the time of the trial it had propagated 200,000 male persons in the state of Indiana, and approximately 5,000,000 in the United States; the dues-paying members in

Indiana of plaintiff organization at this time were approximately 50,000.

Defendant, according to the testimony of Samuel H. Bemenderfer, its chief officer in the United States, was organized to "admit Christian men and women," and to "cleanse the plaintiff organization of its unscrupulous men," "to promote race purity rather than white supremacy," "and to protect its members in their Protestant heritage." Defendant has some 30 to 50 organizations in the state of Indiana, and possibly 300 organizations outside of Indiana. It has 65 to 70 organizations in Illinois, and is authorized to do business in 38 different states. Its constitution designates its local lodges as "klans" and its membership as "Klansmen." Letters written to its members addressed them as "fellow Klansmen," and "loyal Klansmen."

Many of the original members of defendant belonged to Delaware Klan No. 4, a local organization of plaintiff at Muncie, Ind., who became dissatisfied and unruly, and either withdrew or were banished from plaintiff organization, and immediately thereafter they formed an organization, which they called "the Klan of the North," and later changed the name to the present name of defendant. They caused a letter to be written to many of the members of plaintiff organization, saying, among other things: "We wish to impress upon your mind that this is not a new movement, but is a reorganization or regeneration of the old movement of Klankraft."

Defendant charged an initiation fee of $10, but where a member of plaintiff organization joined defendant organization no initiation fee was charged. This initiation fee was called a "Klectoken" by both plaintiff and defendant organizations. At the time the members of Delaware Klan No. 4 were expelled or withdrew, practically the entire membership joined the organization called "the Klan of the North," which later was changed to the Independent Klan of America, and at that time Delaware Klan No. 4 had on hand between $5,000 and $6,000. The undisputed testimony shows that this money was used to pay up bills.

There have been various klans in Kentucky, Tennessee, West Virginia, and other states. They were originally organized for pleasure, and the name "Ku Klux" was invented in imitation of the noise made in cocking a gun. Afterwards the word "Klan" was added. Four thousand Klansmen of Muncie, according to the defendant's testimony, were back of the Klan of the North. They rebelled and formed the Klan of the North.

In the words of Mr. Bemenderfer, "the whole personnel went from one corporate entity over to another, and the purposes of the two entities were absolutely identical."

Mr. Orion Norcross, National Secretary for the Independent Klan of America, testified that there is no similarity in the names of the officers or members of the plaintiff and defendant organizations, except the names "Klansmen" and "Klanswomen." There was evidence that confusion existed among members of plaintiff and defendant organizations; that on several occasions members of defendant attempted to attend meetings of plaintiff, evidently thinking membership in one entitled them to all the privileges of the other.

[2] It is not necessary, however, to justify injunctive relief, that confusion be shown. It is sufficient if confusion will probably follow the use of similar names. It was pertinently said, in a case cited in defendant's brief: "The best possible evidence that names are sufficiently similar to mislead the public is the fact that the public, or some portion thereof, has been misled."

In the case quoted, evidence that the public had been misled was entirely lacking. In the present case, there is undisputed evidence that in at least 12 different instances members of defendant attempted to attend meetings of plaintiff and stated they were Klansmen.

The evidence further shows that, in some instances, these very men surrendered their membership in defendant, when the deception was pointed out and explained to them. This evidence, standing uncontradicted, tends strongly to support plaintiff's claim that there was, in fact, confusion.

[3] Neither is it necessary to injunctive relief that the plaintiff be engaged in business or trading, as this relief has often been extended to charitable, benevolent, fraternal, patriotic, and religious organizations.

[4] The exclusive right to the use of a name is based upon priority of use, and if it be shown that the names of two organizations, whether they be incorporated or not, are so similar as to likely result in confusion, then the courts will enjoin at the request of the one who first adopted and used the name.

[5] Nor does the fact that defendant has been chartered by the state of Indiana afford it any defense or immunity. Incorporators of a company choose its name. They are presumed to know the names previously adopted and used by organizations likely to be competitors, and, if they choose a name colorably similar to that of a competitor, this

has been held to be evidence of fraud, especially if the new organization is likely to profit by the confusion that results from a similarity of the names. A trade-name is very like a trade-mark, and he who first adopts a name is entitled to all the benefits which flow from the use of such name. The name of plaintiff is "Knights of the Ku Klux Klan." The name of the defendant is "the Independent Klan of America."

The word "Klan" was heard very little of in the United States prior to 1916, and was a very uncommon word in the state of Indiana prior to 1921 or 1922. Now it is very well known and has a very distinctive meaning. The press uses it continuously; the people have given to it a secondary meaning, which is the result of associating it with a certain definite organization, to wit, the Ku Klux Klan.

[6, 7] Every one knows what organization is meant when he sees or hears the word "Klan." It is a well-established rule that courts will take judicial notice of what is common knowledge among mankind. In other words, what every one knows, the court is presumed to know. The court in this case is bound to know that the word "Klan" has come to have a secondary meaning, and designates the plaintiff, the Ku Klux Klan, and the word "Klansmen" is a name applied to the members of plaintiff organization. The officers of the defendant organization had this common knowledge when they organized their company, and it is difficult to escape the conclusion that they designedly used the word "Klan," and that they have taken advantage of the publicity given this word and of the advertising effect of plaintiff's long use thereof.

[8] There have been no laches in this case. On the other hand, it would seem that plaintiff was prompt in bringing its suit. In the case of National Circle, Daughters of Isabella, v. National Order, Daughters of Isabella, reported in 270 F. at 723, the Circuit Court of Appeals quoted approvingly from Nims on Unfair Competition as follows: "The doctrine of laches as to stale claims in matters of trust does not apply in full force to unfair competition cases, where acquiescence will not usually be inferred, and, even if at one time the facts would justify a presumption of such acquiescence, there still exists in the first user a right of revocation of such acquiescence."

[9] There could be no laches without acquiescence. There could be no acquiescence without knowledge. A party may be deemed to be estopped if, with full knowledge, he re-

mains silent, his silence being construed as consent; but, if there is implied consent, it lasts no longer than the silence which it springs from. Defendant was incorporated March 7, 1924. This suit was brought February 18, 1925, less than one year after defendant's charter was issued.

Cases are numerous holding injunctive relief proper to stop unfair competition resulting from the use of a name colorably similar to that of a complainant. A few of these cases, together with the volumes where they will be found, are given below: International Committee of Young Women's Christian Association v. Young Women's Christian Association of Chicago, 62 N. E. 551, 194 Ill. 194, 56 L. R. A. 888; Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks of the World, 98 N. E. 756, 205 N. Y. 459, L. R. A. 1915B, 1074, Ann. Cas. 1913E, 639; Philadelphia Trust, Safe-Deposit & Insurance Company v. Philadelphia Trust Co. (C. C.) 123 F. 534; National Circle, Daughters of Isabella, v. National Order, Daughters of Isabella (C. C. A.) 270 F. 723; Modern Woodmen of America v. Hatfield (D. C.) 199 F. 270; Order of Owls v. Independent Order of Owls, title of the case being "Talbot v. Independent Order of Owls," 220 F. 660, 136 C. C. A. 268; Salvation Army in United States v. American Salvation Army. 120 N. Y. S. 471, 135 App. Div. 268; Supreme Lodge of the World, Loyal Order of Moose, v. Improved Benevolent Protective Order of Moose of the World (N. J. Ch.) 123 A. 532. Other citations could be given, but the above list seems sufficient.

[10] There can be no reasonable doubt that the use of the word "Klan" has gained a secondary meaning, and defendant is an infringer. The fact that it will suffer damages if it is enjoined, and will be compelled to change its name if it desires to continue, is not of controlling moment. If it is compelled now to change its name, the loss arises out of its own folly in deliberately choosing a name so similar to plaintiff's that in all reason it must have known it was doing wrong. A wrongdoer cannot complain if it is called to account.

A permanent injunction should be and is hereby granted against defendant, and it is hereby enjoined from using the names "the Knights of the Ku Klux Klan," "the Invisible Empire, Knights of the Ku Klux Klan," "the Ku Klux Klan," or the "Klan," and it is further enjoined permanently from operating in any manner under any of said names, or any similar or like name or names.